[Civil No. 4038.   Filed December 19, 1938.]

[85 Pac. (2d) 713.]

C. I. T. CORPORATION, Appellant, v. S. W. SEANEY, Assignee for the Benefit of Creditors of CARL E. MOLLING and HERLINDA B. MOLLING, Doing Business as MOLLING APPLIANCE COMPANY, Appellee.

Mr. T. G. McKesson, for Appellant.

Messrs. Krucker & Fowler, for Appellee.

LOCKWOOD, J.—This is an appeal from a judgment of the superior court denying a petition of the C. I. T. Corporation, hereinafter called petitioner, for the reclamation of eighteen Servel refrigerators from the possession of S. W. Seaney, as assignee for the benefit of the creditors of Carl E. Molling and Herlinda B. Molling, doing business as Molling Appliance Company, hereinafter called the company, and from the court's order denying a new trial.

The facts of the case are not in dispute, and may be stated as follows: Carl E. Molling and Herlinda B. Molling for several years last past have been engaged in the electric appliance business in Tucson, under the name of Molling Appliance Company. The company had an agency for the sale of Servel electric refrigerators, and during the year 1937 and a part of the year 1938 arrangements were made by the company with the Servel factory at Evansville, Indiana, and with petitioner, for the handling of said agency and the financing of the company therein. This arrangement was, in substance, as follows: The Servel company shipped to the company at Tucson a number of its electric refrigerators, shipper's order, bill of lading with draft attached. The company was unable to pay the draft so it paid to petitioner ten per cent. of the factory invoice price of the refrigerators, together with a sum sufficient to pay the freight charges thereon, whereupon the petitioner issued its check for the entire amount of the draft,

and secured the bill of lading. At the same time the company executed certain so-called trust receipts in favor of petitioner. These trust receipts are all similar in form. On the face of the receipt is a description of the refrigerators covered thereby, together with the invoice price. On the back is found the following language:

"Trust Receipt.

"Received from C. I. T. Corporation (Hereinafter termed C.I.T.) each of the chattels described on the reverse hereof, complete with all standard attachments and equipment, in consideration whereof we agree, at our expense, to hold said chattels in trust for C.I.T. as its property, and agree to return the same on demand in good order and unused but with liberty to us to exhibit and, the written consent of C.I.T. having first been obtained, to sell the same for its account for cash for not less than, as to each chattel, the minimum sale price (the value thereof) set forth as to the respective chattel on the reverse hereof, and we further agree in the case of such sale to hold in trust for C.I.T. the proceeds separate from our funds and immediately hand such proceeds to C.I.T. without expense or cost to C.I.T. C.I.T. may at any time cancel this trust and repossess itself of said chattels or the proceeds thereof.

"We further agree to keep a separate account of all chattels delivered to us under this or any like receipt and of the proceeds thereof when sold, to report any sale to C.I.T. immediately after the same is made, and to furnish to it on demand a true and complete report for the preceding month. We will also permit C.I.T. or its duly accredited representatives to examine our books and the chattels in our possession at all reasonable times during business hours.

"Unless we have arranged with C.I.T. ourselves to provide insurance, C.I.T. shall, during the entire time said chattels are held hereunder, keep same insured against loss by fire and theft, and in the event of our failure to redeliver the same on demand we shall, until redelivery thereof, pay as damages for deten-

tion for each month or portion thereof after demand one per cent of said sale price.

"We further agree to pay all taxes, costs, charges, expenses and disbursements, including a reasonable attorney's fee (15% of sale price of said chattels, if permitted by law) should C.I.T. find it necessary to protect its property in same by legal proceedings involving the employment of an attorney-at-law, and that the waiver of any default shall not operate as a waiver of subsequent defaults, but all rights hereunder shall continue notwithstanding any one or more waivers. We acknowledge receipt of a true copy of this agreement, which shall be construed according to the laws of the State of California.

"The chattels above referred to are listed on face of this form. The acceptance of Time Draft in the above amount shall not be effective to terminate this trust. At C.I.T.'s election any interest of ours in said chattels shall terminate."

Attached to the trust receipt, but with a line perforated so that it might easily be detached therefrom, was the following document:

"Time Draft.

"$1,344.00                    Tucson, Arizona, May 17, 1937

"On or before August 17, 1937 pay to order of C.I.T. Corporation, One Thousand Three Hundred Forty-four and no/100 Dollars $1,344.00, together with a reasonable attorney's fee (15% if permitted by law) should the holder place this draft in the hands of an attorney for collection. Value Received (without recourse on us) and charge to Servel, Inc. Evansville, Indiana.

"To Molling Appliance Company
    "Tucson, Arizona."

And on the face of the document was endorsed "Accepted, Payable at office C.I.T. Corporation, 52 Market St., San Francisco, Calif.," which acceptance was signed by the company in proper form. None of these trust receipts were ever filed or recorded in the office of the county recorder of Pima

county. The Servel company also executed and delivered to petitioner a bill of sale directly covering the refrigerators involved herein. The refrigerators were then taken possession of by the company and placed on its floor for sale to purchasers in the ordinary manner.

Thereafter, and on the 21st day of March, 1938, the company made an assignment for the benefit of creditors, under the provisions of chapter 6 (section 176 et seq.), Revised Code 1928, and S. W. Seaney was appointed as assignee under the statute, and duly qualified and took possession of the eighteen refrigerators which were the subject matter of this proceeding, whereupon petitioner filed its petition claiming ownership and right of possession thereof, and a judgment being finally rendered against it on its petition, brought the matter before us for review.

There are two questions of law for our consideration. The first and most important is as to the nature of the trust agreement above set forth. It is the contention of petitioner that it was either a consignment for sale by petitioner to the company, or a bailment. It is the position of the assignee that it was either a chattel mortgage or a conditional sale agreement. If the document be of the nature contended for by petitioner, it was the owner of the refrigerators and entitled to their possession as against an assignee for the benefit of creditors. If, on the other hand, it was an unrecorded chattel mortgage or conditional bill of sale, it was not entitled to such possession or ownership as against innocent purchasers and *bona fide* creditors, by virtue of the provisions of sections 2890, 2891 and 2330, Revised Code 1928, which read as follows:

"§ 2890. *Conditional sales; validity.* Every provision in a conditional sale reserving property in the seller after possession of the goods is delivered to

the buyer, is valid as to all persons, except as hereinafter otherwise provided; it is void as to any purchaser from or creditor of the buyer, who, without notice of such provision, purchases the goods or acquires by attachment or levy a lien upon them, before the contract or a copy thereof be filed as hereinafter provided; and is void as to all persons except the buyer unless such contract or copy is so filed within ten days after the making of the conditional sale."

"§ 2891. *Place of filing.* The conditional sale contract or copy shall be filed in the office of the county recorder in the county in which the goods are first kept for use by the buyer after the sale; it is not necessary to its validity, or to entitle it to be filed, that it be acknowledged or attested. This section shall not apply to sales of railroad or automobile stage equipment or rolling stock."

"§ 2330. *Without change of possession mortgage void as against third persons unless recorded.* A chattel mortgage or other instrument of writing intended to operate as a mortgage or lien upon personal property, which is not accompanied by an immediate delivery and followed by an actual and continued change of possession of the property mortgaged or pledged by such instrument, is void as against the creditors of the mortgagor or person making the same, and as against subsequent purchasers and mortgagees or lien holders in good faith, unless such instrument or a true copy thereof was forthwith filed in the office of the county recorder of the county where the property was then situate, and if the mortgagor or person making the same be a resident of this state, then also recorded in the county of which he is a resident at the time."

██ ██ It is necessary for us then to determine the nature of the instrument. In so doing, we must remember the rule that it is not the form of an instrument, nor even its precise language, but its legal effect which determines its nature. *Holdren* v. *Board of Supervisors,* 52 Ariz. 429, 82 Pac. (2d) 1095; *In re Bettman-Johnson Co.,* (6 Cir.) 250 Fed. 657. Docu-

ments of this nature were originally used almost exclusively in international trade between importers and exporters, and few questions as to their validity in such matters were ever raised. In recent years, however, the so-called trust receipt has been used in an attempt to solve the problem of financing dealers in such goods as automobiles and the larger electric appliances which require considerable capital investment, and are generally sold on small time payments. This is now usually done through the medium of finance corporations, such as petitioner herein, who advance the funds necessary to pay the manufacturer of the article in full therefor, and then make their own arrangements with the local retail dealers. It is obvious that two problems were bound to arise. The first and, in the eyes of the finance companies, the most important thing was to secure themselves so that irresponsible dealers could not sell the goods to innocent purchasers, collect what they could on the purchase price, and then leave the finance company, which had paid the manufacturer in full, to "hold the sack." At the same time the companies did not wish to follow the usual method of passing title and taking a chattel mortgage back, or even of delivering the goods to the dealer under a conditional sale contract, for such procedure would greatly complicate the situation if the necessity arose of collecting the amount they had advanced by retaking possession of the goods, or foreclosing the mortgage. Attempts were, therefore, made to find some other method of security, and an effort was made to adapt the trust agreement theretofore used in international trade to that purpose. A difficulty, however, soon appeared. It is plain that the only purpose for the intervention of the finance companies in transactions of this nature was to provide funds for financing retail dealers, and that it was never intended that these companies should themselves go into the busi-

ness of selling the various types of goods under consideration at retail. The transaction was in reality a loan by the finance company to the dealer, to be secured in the best manner possible, and the interest of the finance company in the articles involved was in fact that of a lender of money with a lien on the property, no matter what the language used in the preparation of the agreement. But secret liens, though sometimes permitted under the common law, have never been favored where rights were acquired at the cost of general creditors. *Ivy* v. *Commercial Credit Co.,* 173 Wash. 360, 23 Pac. (2d) 19. And the legislative policy of most of the states has been to restrict or, indeed, to abolish such liens. This has usually been done by means of recording statutes, such as sections 2330, 2890, 2891, *supra,* which generally provide, in substance, that a lien on personal property, whether it be in the form of a chattel mortgage or a conditional sale agreement, must be filed and recorded in the statutory manner to have any validity as against either *bona fide* purchasers or creditors. When, therefore, these trust agreements came into general use for purposes like that appearing in the present case, much litigation arose, the holder of the agreement contending, as in the present case, that the instrument was really a consignment for sale, or a bailment, with full title in such holder, while creditors and purchasers insisted that no matter what the form of the agreement, it was, in essence, a lien and, therefore, subject to the provisions of the recording statutes. The decisions are numerous and show a distinct line of demarcation. The federal cases, with few exceptions, hold that agreements of this kind are valid as against general creditors, the questions generally arising in bankruptcy proceedings. On the other hand, the state courts, with the exception of Nebraska, almost invariably say that un-

der conditions like that of the present case, the instrument is, as a matter of law though not of form, either a chattel mortgage or a conditional sale contract and, therefore, subject to the recording statutes of the particular state. So far as the federal courts are concerned, since the opinion in *Erie Railroad Co.* v. *Tompkins,* 304 U. S. 64, 58 Sup. Ct. 817, 82 L. Ed. 1188, 114 A. L. R. 1487, was handed down their decisions on matters of this kind, while entitled to full consideration in so far as their reasoning appeals to us, are not in any sense authoritative on questions of this kind, involving the statutory construction and common-law rule of the state. And since this is a matter of first impression in Arizona, we are free to come to the conclusion which seems best in consonance with sound logic and the public policy. of the state.

It would be of little value that we should review and analyze in this opinion the many cases cited by the parties. The real question is whether or not, as a matter of substance and not of form, the interest of the petitioner in the property was that of an owner, with the dealer merely acting as a sales agent for the petitioner, or whether such interest was in reality that of a lienholder as security for money advanced, with the true interest of the dealer that of an owner subject to a lien.

▪ ■ It appears from the uncontradicted evidence that the refrigerators were ordered from the manufacturer if, as, and when the dealer desired, and not when petitioner preferred; that the dealer paid originally ten per cent. of the manufacturer's sale price, plus the freight on the refrigerators, and that he gave to petitioner an accepted bill of exchange which, of course, was a negotiable instrument having the effect of a promissory note for the balance of the amount still due. Under all these circumstances, we think the

only reasonable conclusion to be reached was that under the trust agreement, no matter what its language, the real interest of the petitioner was that of a lienholder, and that the instrument, therefore, was subject to the provisions of our recording statutes. *General Motors Acceptance Corp.* v. *Seattle Assn.,* 190 Wash. 284, 67 Pac. (2d) 882. It is admitted that these provisions were not complied with, and it necessarily follows that whether the agreement be construed as a conditional sale contract or chattel mortgage, it was void as to the general creditors of the buyer as against the holder of the secret lien. The cases of *Rio Grande Oil Co.* v. *Miller Rubber Co.,* 31 Ariz. 84, 250 Pac. 564, and *Moore* v. *Chilson,* 26 Ariz. 244, 224 Pac. 818, relied on by petitioner, present a very different factual situation and are not in point.

The only other question requiring consideration is whether or not the assignee represents the general creditors, or whether he is merely in the position of the assignor, with all the liabilities of the latter.

██ ██ It is, of course, the general rule that an assignee for the benefit of creditors takes the property subject to all the liens which could be maintained against the assignor and can assert no claim thereto that an assignor might not assert. Am. Jur., vol. 4, p. 388, and cases cited. But while this is generally true, it is not universally so. There are many transactions binding on an assignor which are not binding on an assignee, and we think this applies to transactions which, by statutory law, are declared void as against both *bona fide* purchasers from and creditors of an assignor. In the case of *Bank of Alexandria* v. *Herbert,* 8 Cranch 36, 3 L. Ed. 479, Chief Justice MARSHALL rendered the opinion of the court as follows:

"In this case a bill was brought in the Circuit Court for the county of Alexandria by William Herbert, Jr.,

trustee for the creditors of John Potts, an insolvent debtor, against the bank of Alexandria, to recover the proceeds of a tract of land, the property of Potts, which had been sold by consent, and the money deposited in bank.

"This land had been conveyed by Potts to the bank, to secure the payment of a sum of money borrowed by him, but the deed of mortgage had not been recorded until eight months after its date had elapsed. The law of Virginia, which governs this case, declares all deeds of mortgage whatsoever, though good between the parties, to be void as to creditors and subsequent purchasers without notice, unless they be recorded within eight months from the date.

"The question is whether this mortgage can be set up in favor of the bank against the trustee for the creditors. . . .

"The resemblance between the trustee for the estate of an insolvent debtor in the District of Columbia and the assignees of a bankrupt is admitted; yet a clear distinction exists between the cases cited at bar and that before the court. In those cases the deed was declared void without any view to creditors. In this case the deed is declared void for the particular benefit of creditors. *To set up this deed against the creditors would be to defeat the very object for which the law was made."* (Italics ours.)

The situation in that case was precisely like the one before us, involving the comparative rights of general creditors and the holder of a lien which was not recorded according to law. We hold, therefore, that although the assignor could not have defeated the lien of the petitioner had the property remained in his possession, yet his assignee for the benefit of creditors had the right to claim, and was under the duty of claiming, the property for the general creditors of the estate, of whom, of course, petitioner is one, as against the secret lien of the latter.

McALISTER, C. J., and ROSS, J., concur.